## RUMBLY *vs.* STAINTON AND WIFE.

1. When slaves are sent by a father to his daughter's home on her marriage, the presumption of law is, that they are intended as an advancement to the husband, and they became his property prior to the passage of the laws securing to married women their separate estates. This presumption can only be rebutted by proof of a different intention, clearly and distinctly avowed by the donor at or before the time of delivery; his subsequent declarations, unless made in the presence of the donee and sanctioned by him, are not admissible for any purpose, in a contest between the donor and donee, or those claiming under them.

2. If the husband, in such case, after the delivery of the slaves, accepts a deed from the donor, conveying them to his wife and the heirs of her body, his marital rights are not thereby affected.

3. Evidence held insufficient to authorize the reformation of a deed of gift to a married woman, on an allegation of the donor's intention to exclude the marital rights of her husband.

4. An amended bill, which is repugnant to the original bill, cannot be allowed.

5. A bill will not be dismissed without prejudice, when the complainant has had ample opportunity to hunt up his testimony and prepare his case on the merits.

APPEAL from the Chancery Court of Monroe.

Heard before the Hon. J. W. LESESNE.

STAINTON and wife, and the former as administrator of two infant brothers of his wife who died in 1833, exhibited their bill in chancery, setting forth that the defendant, Rumbly, married Christiana Manning in 1827; that shortly after the marriage

the father of Mrs. Rumbly gave to her, for her own separate use, two negro girl slaves, and afterwards made to her a deed for them, which read, "to her and her heirs." This deed was delivered to her then husband, the defendant, who refuses now to produce or exhibit it, and claims and holds the slaves as his own. The bill further alleges, that the deed was drawn by an eminent lawyer, but that he mistook the instructions given him, which were that the slaves should be secured to Mrs. Rumbly as her separate estate. It further sets forth the death of Mrs. Rumbly in 1831, and that the complainants are all the heirs at law of Mrs. Rumbly; and prays that Rumbly may produce the deed, and that the same may be so reformed as to make it speak the intentions of the grantor, and that Rumbly be decreed to deliver up to complainants the slaves, and their increase, and to account for hire, &c.

Rumbly, the defendant, admits the marriage as charged in the bill, and that the complainants are the only heirs at law of his late wife Christiana; denies that Manning, his father-in-law, ever gave the negro slaves named in the bill to his wife in the manner set forth; but avers, that Rachel, one of the slaves mentioned, was given to him by Mr. Manning on the morning after his marriage, and sent to his house a day or two afterwards by the wagoner who brought the balance of his wife's chattels from her father's; that Critty, the other slave named, was sent to his house by his father-in-law, some time afterwards, unaccompanied by any words of gift; that he has ever since had both slaves in his possession; that after they had been in his possession for some time, his father-in-law proposed to make him a deed for them; to which he replied, "he (Mr. Manning) might consult his own pleasure about it;" shortly after this, Mr. Manning delivered him a deed for them, which conveyed them to his wife "and her heirs;" he does not know what has become of that deed; he has sought for it, and cannot find it, but thinks he gave it to the clerk of Monroe County Court, to be recorded, and supposes that it was burnt when the clerk's office of that county was afterwards destroyed by fire; it was not acknowledged by Manning or proved by the witnesses; he has always held the slaves as his own, and has no knowledge that Mr. Manning ever intended them to be held otherwise; denies that they were, or were ever intended by the donor to be, the

separate estate of his wife; does not claim alone under the deed, but under the parol gift formerly made which was in conformity with the deed of gift, in legal effect.

An amended bill was filed by Stainton and wife alone, without uniting the interests of the deceased infants, and to which they are not parties; in which it is alleged, that the slave Critty was given by Manning to Mrs. Stainton, before the deed was made to the defendant, and it is prayed that, as to said slave, the defendant be decreed to deliver her up, with her increase and hire, to Stainton, for the use of his wife. The answer to this bill denies its allegations, and concludes with a demurrer for want of equity, as the complainants had a plain remedy at law. It does not appear in the record that this demurrer was ever acted on by the court.

The proof, so far as it is deemed material, is noted in the opinion of the court. The Chancellor granted the relief sought by the bill, and his decree is now assigned for error.

R. C. TORREY, for the appellant, contended that the evidence was uncertain, contradictory, and insufficient to authorize the reformation of the deed, or the granting of the relief sought by the bill. He cited Bethea v. McCall, 5 Ala. 311; Miller v. Eatman, 11 ib. 613; Burnett v. Br. Bk. at Mobile, 22 ib. 642; Gayle v. Hudson, 10 ib. 128; Olds v. Powell, 9 ib. 865; 1 Story's Equity, pp. 164, 165, §§ 152, 153; Inge v. Murphy, 10 Ala. 885; Betts v. Betts, 18 ib. 787; Williams v. Maull, 20 ib. 721.

S. J. CUMMING, contra, in support of the decree, contended:
1. That a court of chancery has power to decree the reformation of a deed.—Stone v. Hale, 17 Ala. 557; Whitehead v. Brown, 18 Ala. 682.

2. That the delivery of the negroes by Manning to Rumbly was a mere loan, as shown by the testimony, and that the title remained in the donor up to the making of the deed.—Olds v. Powell, 9 Ala. 861; 7 ib. 652; Miller v. Eatman, 11 ib. 609; Williams v. Maull, 20 ib. 729; Burnett v. Br. Bk. at Mobile, 22 ib. 642.

3. That the proof of mistake in drawing the deed was sufficient to authorize its reformation.—Stone v. Hale, 17 Ala. 557;

Rumbly v. Stainton and Wife.

Whitehead v. Brown, 18 Ala. 682; Betts v. Betts, 18 Ala. 787.

4. That, admitting the previous delivery of the slaves to Rumbly, his acceptance of the deed was a waiver of his prior rights, and was equivalent to his consent to hold the slaves under the deed.—Inge v. Murphy, 10 Ala. Rep. 894; Fellows, Wadsworth & Co. v. Tann, 9 ib. 1003.

5. If the court should think proper to reverse the decree, he requested that the reversal might be without prejudice to any future suit at law or in equity.

LIGON, J.—It is legally impossible, on the pleadings and proof in this case, to sustain the decree of the Chancellor.

The only equity in the original bill is to be found in those allegations which relate to the mistake in drawing the deed from Manning, the father-in-law, to Rumbly, for the slaves in controversy; and the proof does not make out these allegations with that clearness which is required before a court of equity will touch the solemn deed of a party, and make it speak a different language from that employed on its face.

The proof in this case, in relation to the gift of the slaves, is confused and contradictory; and the same may be said of that which relates to the making of the deed now sought to be reformed.

On the first point, Julia Manning swears, that she frequently heard Manning (the donor) say, that he never intended to give Rumbly any of his property so that he could spend it, but intended what he gave for the use of his daughter and the heirs of her body; these intentions were so expressed both before and after Rumbly's marriage; that Rachel was given to his daughter, and Critty to Mrs. Stainton, his granddaughter, *as she heard the donor say*; she was not present when Rachel was given, but it was immediately after Rumbly's marriage, and Critty was not given until after the birth of Mrs. Stainton.

A. B. Manning deposes, that the donor was his father, and after the marriage of Rumbly his father *loaned* the girl Rachel to Mrs. Rumbly, as he heard his father say. He also heard him say, that he would not give his sons-in-law any thing; that he intended to secure it to his daughters during their lives, and to their children at their death; Rachel went into Rumbly's

possession immediately on his marriage, and Critty after the birth of Mrs. Stainton; both slaves were in possession of Rumbly and wife before the deed was drawn.

Eliza Rumbly, a daughter of donor, heard her father say, he would not give his sons-in-law any thing; he was in the habit of *loaning* slaves to his married daughters.

John Emmons proves, that Manning *gave* two slaves to Rumbly, one on his marriage, and the other some time afterwards, as the donor himself informed witness; that the slaves were named Rachel and Critty; witness knew the donor well, and was on very intimate terms with him; Rumbly had the slaves in possession; witness never heard of any separate estate in his wife.

Asa Parker proves, that he lived in the neighborhood of the donor and Rumbly since 1832, and knew both; Rumbly has had possession of the slaves during that time, using them as his own.

Wm. Raney is a grandson of donor, and lived with him when Rumbly was married, and from that time until his death; he proves that the negroes were delivered to Rumbly, or Rumbly and wife, by his grandfather; he drove the team that removed the effects of Mrs. Rumbly from her father's to her husband's house.

Thus it appears, that the witnesses, who attempt to show that the gift to Rumbly, on his marriage, of the slave Rachel, was not absolute in its terms, none of them, speak of what occurred at the time of the delivery, but testify of loose, general declarations of intention made by the donor, in many instances after the slaves had gone into Rumbly's possession, and at no time when he was present. Opposed to this is the fact, admitted by all, that the girl Rachel was delivered to Rumbly immediately after his marriage, and ever afterwards was retained and held by him as his own.

In such cases, the law presumes that the property, thus sent home to the daughter, by the father, is an advancement to the husband; and, as the law stood in 1827, when this delivery was made, it became the property of the husband, and the dominion of the donor over it ceased, so soon as the gift was perfected by delivery.—Miller v. Eatman, 11 Ala. 613. This presumption can only be rebutted by proof of a different inten-

tion, clearly and distinctly avowed by the donor, at the time the property is delivered, or the terms of the gift declared before the delivery takes place.—Miller v. Eatman, *supra*; Burnett v. Br. Bk. at Mobile, 22 Ala. 642. The after declarations of intention, on the part of the donor, unless made in the presence of the donee, and sanctioned by him, are not admissible, for any purpose, in a contest between the donor and donee, or those claiming under them.—Olds v. Powell, 9 Ala. 864. Apply these rules to the case before us, so far as it relates to the girl Rachel; and it is perfectly clear, that the marital rights of Rumbly attached fully to her, long before any deed was projected or made by Manning, the donor.

But it is said, that he (Rumbly) waived any right he might have had to the slaves, by virtue of the original gift, by accepting the deed. Suppose this were true, and that the deed handed him by Manning was to be looked to, as the sole evidence of his title, and the exponent of the donor's intentions as to both the slaves. Rumbly's interest would be the same, viz., an absolute property in them. So that, whether his title is made out by the proof of the gift by parol, accompanied with his possession under it, or by the deed delivered to him by his father-in-law, his right is the same; and the want of interest in the complainants is as well established in the one case as the other. For the deed, by the admission of all parties, vested the property, by its terms, in Mrs. Rumbly and her heirs, or the heirs of her body, and in such case the husband's marital rights would immediately attach.

2. The complainants, however, seek to reform the deed, upon the ground that its terms did not conform to the instructions given to the draftsman, or the intentions of the donor as declared to his agent at the time he was sent to the attorney to have the deed drawn. On this subject the proof is by no means free from conflict. The son of the donor, who went to Messrs. Cooper and Parsons, to have the deed drawn, says, that the instructions which he carried were for a deed to secure to Mrs. Rumbly a separate estate in the slaves. While the grandson of the donor says, he drew up a deed for Mr. Manning a few months before his death, giving these slaves to *Mrs. Rumbly and her children*, and afterwards another deed was drawn by a lawyer, giving the negroes *to her and heirs*; that Mr. Manning

dictated to witness how he wanted the deed drawn, and witness wrote it down, and it was taken to the lawyers (Cooper & Parsons), who drew up the deed from these instructions ; he never heard the donor say any thing about giving the property in such a way that Rumbly could not control it, or to exclude his rights. This witness lived constantly with the donor before the marriage of Rumbly, and up to the period of the death of Manning. His opportunities of knowing the intentions of his grandfather were evidently as good as, if not better than, those of any other person who has been examined ; and, when we reflect that what he says is entirely consistent with the unrestricted gift of the slaves in the first instance, as proved by several witnesses, and with the terms of the deed afterwards signed and delivered by the donor (who had read and sanctioned it, before he signed it), it is difficult, if not impracticable, for an unprejudiced mind to resist the conclusion, that it is the true history of the transaction. We do not think the proof of intentions of the donor, differing from those expressed in the deed, sufficiently clear and certain to authorize us in decreeing a reformation of it.

Upon the whole, we are of opinion, that Rumbly's right to the slaves in controversy was absolute and complete under the verbal gift and delivery of them to him, by his father-in-law (Manning), before the deed was made ; and in accepting a deed which conveyed them to his wife and her heirs, he cannot be held, as the Chancellor supposes, to have agreed to hold them by a different tenure than that expressed on the face of the deed ; nor can he be brought in subjection to any secret trust which was not made known to him at the time the deed was delivered, and assented to by him.

The amended bill does not seem to have commanded the attention of the court below, nor is it necessary to be noted here, except to say, that it is repugnant to the original bill, and for this reason should not have been allowed to be filed as an amendment. As an original bill, it is without equity, as in the case made by it the remedy is at law.—McCullough and Wife v. Walker and Wife, 20 Ala. 389.

The decree of the Chancellor, reforming the deed and directing an account, is erroneous, and must, therefore, be reversed. A decree must be here rendered dismissing the bill, at the cost of the appellees, both in this court and the court below.

It has been requested by the solicitor for appellees, that in the event the court should conclude to reverse the decree, and dismiss the bill, such dismissal should be without prejudice. There is no special reason in the record to justify such a course, but much, very much, to forbid it, and none is given outside of the record. There must be a time for litigation to end ; and when the parties have had every opportunity to hunt up their testimony, and prepare their cases on the merits, as seems to have been the case here, we are not inclined to indulge a spirit of useless and vexatious litigation, which, from all that appears here, would be the result in this case.