# Gilmer *v.* Morris.

*Bill in Equity by Pledgor, for Account of Stock Transferred as Collateral Security.*

1. *Pledge as collateral security; limitation of right to redeem.*—By an ancient rule of law, as laid down in old text-books and adjudged cases, if no time was fixed by the parties themselves for the redemption of a pledge, the pledgor was allowed his life-time within which to redeem, unless quickened by notice, or through the intervention of a court of equity; but the more modern, and the better rule, by analogy to that which applies to the redemption of mortgages, exacts of him the exercise of reasonable diligence, at the risk of being barred of all relief on account of the staleness of the demand.

2. *Same; staleness of demand.*—In the application of the doctrine of staleness, a defense peculiar to courts of equity, the tendency of modern decisions is to shorten the period allowed for the assertion of equitable rights, though each case is somewhat dependent upon its own peculiar facts and circumstances; and where the pledgor of stocks seeks, by his bill to redeem, to make profit out of an unexpected rise, a shorter period is allowed, than where he seeks to make the pledgee account only for a surplus received on an ordinary sale.

3. *Same; case at bar.*—In this case, the alleged pledge of stock in a private land company was made in 1871; the pledgee advanced money, from time to time, on the faith of it, "carrying it" for the pledgor during a series of years, while its value was fluctuating, sometimes worth

[Gilmer v. Morris.]

only twenty cents on the dollar, and never more than the amount advanced on it; and he finally sold it 1881, when it approximated par value, for less than the amount advanced on it up to that time. *Held*, That a bill filed in 1884, and seeking to hold the pledgee accountable for the value as rapidly appreciated after the sale, until it was worth twenty for one, was properly dismissed, on account of the staleness of the demand.

APPEAL from the Chancery Court of Montgomery.

Heard before the Hon. JOHN A. FOSTER.

The bill in this case was filed on the 7th July, 1884, by James N. Gilmer, against Josiah Morris and the firm of J. Morris & Co., but afterwards amended so as to proceed against said Morris alone; and sought an account and redemption of sixty shares of stock in the Elyton Land Company, a private corporation, alleged to have been pledged and transferred by complainant to said Morris, on the 30th March, 1875 (as alleged in the original bill; in December, 1871, as alleged in the amended bill), as collateral security for an existing debt, and afterwards held by agreement for additional advances made on the faith of it. The transfer of the stock was in the following words: "For value received I hereby sell, transfer and assign to Josiah Morris the shares within mentioned, and authorize Josiah Morris to make the necessary transfer on the books of the company. [Signed] J. N. Gilmer. In presence of F. M. Gilmer, Jr., March 30th, 1875." The bill avers that notwithstanding the transfer is absolute in form, it was understood and agreed at the time between the complainant and Morris that the latter should hold the stock in trust and as collateral security for an indebtedness of three thousand dollars which complainant's firm of Gilmer & Donaldson then owed to the partnership of Josiah Morris & Co., of which said Morris was the senior member; that the first intimation complainant had that Morris denied that he held said stock in trust, and claimed it as his own, was about three months before the filing of this bill, when complainant called on Morris for a settlement and was informed that the stock had been sold, and the right of complainant to the stock denied. The bill further avers that Morris had received dividends on said stock sufficient to pay off the debt for which it was pledged, with the interest thereon; prays a decree declaring said transfer of stock was made in trust and as collateral security, and that an account be had of the dividends paid, applying the same to the payment of said indebtedness and the balance to be paid to complainant; that Josiah Morris be required to transfer the stock claimed to complainant, and for general relief.

Respondent Morris, after demurring to the bill for staleness, and on the ground that complainant was barred by the stat-

[Gilmer v. Morris.]

nte of limitation of six years, answered, averring that on the 30th December, 1871, a certificate for sixty shares of the Elyton Land Company stock was issued to complainant, but delivered to the said Morris, and was immediately transferred by endorsement to Morris by complainant; that this was done for the benefit of complainant's father, F. M. Gilmer, who, by reason of his official position as president of the South and North Ala. R. R., and individual financial condition, requested that the stock be issued in the name of complainant; that Morris agreed to pay for the stock and carry it for F. M. Gilmer; that complainant immediately transferred the stock by endorsement to the respondent, Morris, who held it until March 30th, 1875, when this certificate was surrendered and a new certificate for the same amount was issued therefor to, and in the name of, Josiah Morris, who held it until April, 1881, when he sold it. Respondent avers that it was agreed between the said F. M. Gilmer and respondent that respondent should hold the stock as security for the payment of its price, which was paid to the Elyton Land Company by Morris, and for a previous indebtedness of said F. M. Gilmer to respondent, amounting to about two thousand dollars, with the privilege in Morris to sell the stock at any time. Evidence was offered by complainant to show that Morris held the stock as a pledge and disposed of it without authority. Morris sought to show that complainant never owned the stock at any time; that F. M. Gilmer had been offered the option of paying for it, but had not done so, and that he considered and disposed of the stock as his own, in payment of what the Gilmers owed him. On the hearing the complainant's bill was dismissed as barred by lapse of time, from which action of the chancellor this appeal is taken.

DAVID CLOPTON, GUNTER & BLAKEY, for appellant.

TROY, TOMPKINS & LONDON, WATTS & SON, *contra*.

SOMERVILLE, J.—The view of this bill most favorable to complainant is that of one filed for the purpose of redeeming certain shares of corporate stock alleged to have been deposited with the defendant by way of pledge or collateral security; or, more accurately speaking, to hold the defendant liable for the appreciated value of the stock, upon the ground that he had sold it without authority and without any notice to the complainant, who claims to be the owner and the pledgor. It is very questionable, however, whether the allegations of the bill will bear this construction, if subjected to proper criticism, and construed with requisite strictness against the pleader. The deposit of stock is averred and proved to have been made

in the early part of the year 1871. The bill was filed on the seventh day of July, in the year 1884, or more than thirteen years after the original deposit. There is neither averment nor satisfactory proof of any recognition, on the defendant Morris' part, of any existing trust relationship between himself and the complainant intermediate between the time of the original transaction and the filing of the bill. In the year 1881, the defendant sold the stock in controversy, it being then of less value than the amount of his pecuniary demands claimed to be secured by it. After that time it appreciated rapidly in value, and is shown by the evidence to have reached eight times its *par* value.

The bill was, on the hearing of the cause, dismissed by the chancellor as barred by lapse of time, and the complainant brings this appeal.

It is our opinion, after a very careful consideration of the law and facts of the case, that the bill was wanting in equity as an attempt to enforce a stale demand, and that the decree was free from error. Considering the transaction, in the first place, as a mere ordinary pledge of stock, rather than as partaking of the nature of both a pledge and a mortgage, as it may well be construed to be, we nevertheless deem the complainant's right of redemption to be barred by the lapse of time.

It is true that we find the rule declared in the old books, and reiterated in many adjudged cases, ancient and modern, that if no time of redemption is fixed by the parties, the pledgor has his lifetime within which to redeem, unless quickened by notice, or through the intervention of a court of equity. This principle, however, is not in harmony with the more modern, and as we consider, the sounder and better rule, which is to exact of all claimants in cases of this character, analogously to the redemption of mortgages, the exercise of reasonable diligence in the enforcement of their equitable demands, at the risk of being debarred of all relief. It may be, as often said in the text-books, that, strictly speaking, the statute of limitations does not run against a pledgor, in an ordinary case of pledge, unless there is shown to be an adverse possession by the pledgee, brought home to the knowledge or notice of the pledgor. But staleness of demand, which is a defense peculiar to courts of equity, rests on another, though no doubt analogous principle, which is to visit on one, who sleeps on his rights, the fruits of his own negligence and infirmity of purpose. 2 Story's Eq. Jur. § 1884. The doctrine of staleness may properly be said to be "founded in its origin upon a sound public policy, which has a just regard for the preservation of the peace of society. It is of the utmost moment that there

6

should be some end to law suits, an unreasonable encourage-
ment of which is disastrous to the welfare of any government.
Hence, reasonable diligence in the assertion of one's rights in
the courts is properly exacted, not less than the exercise of con-
science and good faith."—*Nettles v. Nettles*, 67 Ala. 599.

The growing importance of trade and commerce, with the
increase of the means of rapid transit and speedy communica-
tion, have tended in modern times to shorten the period allowed
by courts of equity beyond which a demand is considered stale
on the ground of *laches*.  The common law is no rigid system
of unbending iron rules, but the elasticity of its principles is
daily yielding to the growing wants of an advancing civiliza-
tion.  A rule of absolute repose has accordingly been adopted,
in comparatively modern times, which is applicable to all
human transactions open to judicial investigation, and by com-
mon consent, is fixed at a period of twenty years.—*Garrett
v. Garrett*, 69 Ala. 429.  The doctrine of staleness accommo-
dates this rule to the equities of each particular case.  If it
were otherwise, the numberless mercantile and other transac-
tions of our populous towns and cities would, in due course of
time, oppress the courts with a burden of litigation which they
would be incapable of enduring.  No sound reason is per-
ceived why the redemption of pledges should constitute an
exception to this salutary principle.  There is nothing in the
relation of pledgor and pledgee which makes an invasion of the
general rule, as applicable to them, either proper or desirable.
And such, in our judgment, is the current of authority among
the law writers, and especially the more recent ones.  We ac-
cordingly find in Story on Bailments the principle asserted,
that while prescription or the statute of limitations does not
run against a pledgor's right of redemption, yet that "after a
long lapse of time, if no claim for redemption is made, the
right will be deemed to be extinguished, and the property will
be held to belong absolutely to the pawnee."  "Under such
circumstances," it is added, "a court of equity will decline to
entertain any suit for the purpose of redemption.  A like rule
is adopted in the common law in cases of mortgages."—Story
on Bailments (8th ed.), § 346.  So in the recent treatise of Mr.
Schouler on Bailments, after asserting that modern prescrip-
tion, as applicable to pledges, runs rather by lapse of years
than the uncertain span of human life, and that "time puts an
absolute barrier to the pursuit of all such remedies, irrespec-
tive of the living or dead," the author further observes:
"Strictly speaking, the statute of limitations does not run
against a pledge; but, inasmuch as it runs against the
pledgee's enforcement of the secured debt or engagement, so
will equity decline to entertain the pledgor's bill for redemp-

tion if he or his representative bring it unreasonably late; for the property will then be conclusively presumed to have vested in the pledgee."—Schouler's Bailments, 225. The same principle is recognized by other authorities, in language but slightly different.—Wood on Lim. Actions, p. 54, § 22; *McClenny v. McClenny*, 49 Amer. Dec. 738; *Whelan v. Whelan*, 26 Ohio St. 131; Colebroke on Coll. Securities, § 132. In *White Mountain R. R. Co. v. Iron Co.* 50 Vt. 57, the reason for extinguishing the pledgor's right to redeem, in such cases, seems to have been placed on the theory that an unreasonable delay in asserting it "raises the presumption that the pledgor has relinquished his title in satisfaction of the debt." Another, and perhaps equally good reason is, the running of the statute of limitations against the pledgee operating to bar the enforcement of his debt against the pledgor personally.—Schouler's Bailments, 224–225. This is upon the principle that courts of conscience favor the feature of reciprocity in its enforcement of equitable rights.

What lapse of time shall be regarded as rendering a pledgor's right of redemption stale can not of course be formulated into any fixed rule applicable to all cases. Each case must necessarily depend upon its own circumstances, having regard not alone to the mere question of time, but also to the circumstances and relative situation of the parties, the nature of the property pledged, whether stationary or fluctuating in value, and other facts affecting the justness or equity of the right asserted. It is, therefore, as said by Mr. Schouler, "largely a matter of judicial discretion." Schouler's Bailments, 225, *note* 2. It is not questioned, so far as we know, by any authority, that the pledgor may always claim at least the period of six years, or the full period of time during which the pledgor is permitted to sue upon his secured debt or engagement. In *Humphries v. Terrell*, 1 Ala. 650, it was held, that the right of both a pledgor and of a mortgagor to redeem personal property would be barred in six years; and the plea of the statute of limitations of six years in that case was held good as a bar to the pledgor's right to redeem, without any positive evidence of an adverse possession. There is other respectable authority for the same view. But this case, in the phase of it now under consideration, does not necessarily require that we should carry the rule to this extent. The case of a mere pledgee, it is apprehended, is different, in some material aspects, from that of a mortgagee in possession, in whose favor the statute of limitations commences to run from the law day of the mortgage, because of his presumed adverse holding from that time. *Byrd v. McDaniel*, 33 Ala. 18; *McCoy v. Gentry*, 73 Ala. 105. All that we need say on this particular phase of

[Gilmer v. Morris.]

the case is, that the pledgor will be barred by delaying for an unreasonable length of time, which must be determined by the varying facts and equities of each particular case. In *Waterman v. Brown*, 31 Penn. St. 161, the court refuses to grant relief, on a bill filed for the redemption of certain shares of bank stock, after the lapse of eleven years, the stock having in the meanwhile risen in value. The court, adopting the rule announced in *Humphries v. Terrell, supra,* held that the plaintiff's equity was barred by a delay of six years after the debt fell due, a demand for the debt being presumed to have been made in a reasonable time. The stock there in controversy, as here, had been transferred to the defendant, and having remained for a long time of less value than the amount of the secured debt, it was deemed to have been abandoned in satisfaction of it by mutual acquiescence. "We should administer equity very badly," said Lowrie, C. J., "if we should allow the plaintiff to treat the stock as the defendant's for so long a period, and the debt as paid by it, and then to claim the benefit of a rise in value occasioned by no merit of his." So in *Roberts v. Sykes*, 30 Barb. (N. Y.) 173, it was held that a bill to redeem certain pledged stocks, which had been transferred to the pledgee, on the books of the company, must be within ten years from the time the secured debt became due, by analogy, no doubt, to the statute of limitations governing claims to personal property in courts of law.

It is well settled that a much shorter time will be allowed the pledgor within which to exercise the right of redemption where he seeks to make a profit out of the unexpected rise in the value of pledged stocks, than where he seeks merely to compel the pledgee to account for a surplus received by him from the sale of the stocks in ordinary cases. Schouler's Bailments, 225. The case of *Hancock v. Franklin Ins. Co.*, 114 Mass. 155, cited and relied on by appellant's counsel, was obviously a case of the latter kind, and was determined, strictly speaking, rather on the ground of the statute of limitations than upon any alleged staleness of the demand. This rule of redemption is clearly analogous to the one which requires the exercise of any simular option in property, real or personal, to be put in action with reasonable diligence. There is something in the nature of fluctuating stocks which makes the principle especially just when applied to them. As said by Mr. Justice MILLER, in a recent case, decided by the Supreme Court of the United States, "the injustice is obvious of permitting one, holding the right to assert an ownership in such property, to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit." *Twin-Lick Oil Co. v. Mar-*

[Gilmer v. Morris.]

*bury*, 91 U. S. 587. The court observed further that while a different rule would apply to property not subject to rapid fluctuations in value, yet, where property is of this character, courts require "prompt action in all who hold an option, whether they will share its risks, or stand clear of them."

These observations apply with great force to this case. The stock in question is shown, at one time during the period it was pledged, to have been worth as little as twenty cents on the dollar. At the time of its sale by the defendant it was not above *par*. When the bill was filed it had rapidly increased in value, and during the progress of the cause reached about eight times its *par* value, or nearly forty times the lowest rate to which it had once fallen. It is manifest that, in cases like this, justice can be administered only by curtailing the period allowed for exercising the option of redeeming within bounds which reasonably conform it to the equities of the peculiar emergency.

Upon this state of facts we hold that the complainant's right of redemption was a stale demand, and must be deemed to have been barred by unreasonable delay in its assertion. Sleeping on his rights for so great a length of time constitutes a degree of *laches* now fatal to their enforcement.

There is another analogous view of this case, incidentally adverted to by us above, and which is equally fatal to the maintenance of the bill. It is the defense of the statute of limitations of six years, the ground upon which the case was decided by the Chancellor.

The transfer of the stock in controversy is something more than a mere pledge. It partakes of the nature of both a pledge and a mortgage, because the transferree holds both the possession and the title of the thing transferred. The chief difference between a pledge and a mortgage is, that in the former possession is transferred, and in the latter title, usually unaccompanied by possession. No reason is preceived why the two forms of security may not be combined in one as is here done. *Casey v. Cavoroe*, 96 U. S. 467, 477. In *Nabring v. Bank of Mobile*, 58 Ala. 204, it was said, *arguendo*, that a transfer of stock, like that in the present case, was rather a pledge than a mortgage, following the view expressed in *Wilson v. Little*, 2 N. Y. 442. But the decision of this point was a *dictum*, in as much as it was immaterial and unnecessary, the same result following whether the transfer was construed to be the one or the other. In this aspect of the law, to which I am not averse, there can be no room for disputation as to the fact that the case made by the bill was barred in six years from the day of forfeiture, there being no proof of any recognition of the complainant's title within this period, and

[Gilmer v. Morris.]

therefore a presumed adverse holding by the defendant. *Byrd v. McDaniel*, 33 Ala. 18; *Humphries v. Terrell*, 1 Ala. 650; *Waterman v. Brown*, 31 Penn. St. 161, *supra*; Jones on Chat. Mort. §§ 771–772.

The bill was properly dismissed, and the decree of the chancellor is affirmed.

CLOPTON, J., not sitting.

STONE, C. J.—The spirit of modern jurisprudence is to shorten the time in which business transactions may be made the subject of juridical contention. Statutory bars are shortened, and the courts of the country at the present time are much more inclined than they formerly were to discourage and discountenance the stirring up of ancient, or stale demands. The theory on which the modern policy rests is, that claims of real merit, in these stirring times, will not be permitted to slumber through an indefinite or unreasonable number of years. And, when the case presented is one of patent inequality, one in which the right claimed has no corresponding liability resting on the claimant, courts are much more averse to granting active relief, than if the liabilities were mutual. This Court has placed itself unmistakably on the side of the shorter limitations, and the discouragement of stale claims. *James v. James*, 55 Ala. 525; *Gordon v. Ross*, 63 Ala. 363; *Cotton v. Cotton*, 75 Ala. 345.

I have read and scrutinized the testimony in this record with very great and painstaking care. I find not a semblance of proof that at any time after the spring of 1875, any credit was extended to F. M. Gilmer, to J. N. Gilmer, or to any of the firms with which the latter was connected, on the faith of the stock in the Elyton Land Company as a security. I do not find it was ever mentioned between the parties, or had in contemplation in connection with any of their dealings, when they took place. On the contrary, the proof is, that whenever any credit was extended by Morris, or Morris & Co., to F. M. Gilmer, either for himself, or for any of J. N. Gilmer's firms, other sources of payment were looked to, and stipulated for. And, in fact, I do not find the stock was ever spoken of, or looked to as a means of security, or source of payment, in any of the credits extended by Morris after the stock was transferred and placed with him in 1871, except what is hereafter stated. If it was thought of as a security for any future credits, the present record contains no proof of it. It may be, and probably is, true, that after those debts were contracted, Morris intended that if the stock ever became of sufficient value, he would resort to it as a means of security and payment as far as it would go; but there is neither averment nor proof of any

agreement to that effect. This, if entertained at all, was a mere uncommunicated intention, and does not amount to a recognition of appellant's continued claim, or ownership of the stock, unless what is hereafter stated shows such to have been the intention. Nor does the fact that Morris, up to the time he disposed of the stock in 1881, would have been willing to have the stock redeemed, if the Gilmers, or either of them, would pay him the several liabilities under which they rested, vary the question. That, at most, was a mere uncommunicated mental purpose—perhaps not thought of, nor entertained at the time it would have been possible of performance. A mere afterthought, which any sane man would entertain, who held a large claim and insufficient means of collection. There must, in the nature of things, be a time in all such transactions, when the pledgee or mortgagee ceases to look upon the thing pledged or mortgaged as a continuing security for a subsisting demand, and commences to treat it as his own property, made such by the pledgor's delay and *laches*. I repeat, there is no testimony —not the slightest—of any act done, or word spoken after the transfer of the stock on the books in 1875, tending to show that any transaction was had between the parties, in which the stock was to any extent a factor, unless the following question and answer furnish such testimony. Morris, while being examined as a witness, was asked, "Then how can you say, Mr. Morris, as you have said, that Mr. Gilmer agreed with you that that stock should be held by you as collateral for anything that he, or Gilmer & Donaldson, or Gilmer, Browder & Co., did owe, or might owe?" The Mr. Gilmer here referred to was F. M. Gilmer. To this Morris answered: "Yes, sir; it is the truth, because I talked to Mr. Gilmer very frequently about it, threatening to sell it."

The firm of Gilmer, Browder & Co. was formed in 1868, and expired in 1873 or 1874, when the firm of Gilmer & Donaldson was formed. The latter firm expired at the death of Mr. Donaldson in 1876. The last transaction had between Morris and Gilmer & Donaldson, of which we have any testimony, were a deposit in March, 1875, and execution against J. N. Gilmer, levied on the stock and paid by Morris, charged against that firm in July, 1875.

No date is fixed by the witness, nor in any other way, when Morris "talked to Mr. Gilmer very frequently about it, threatening to sell" the stock. Whether it was before or after the transfer of the stock on the books, or, if after, how long after, we have no means of finding out. We can not say it was later than 1876, or as late as 1876. We have Morris' uniform testimony that he ceased to look to it as an available demand after the actual transfer of the stock in 1875, and we can not say

there is any testimony which contradicts this. True, he had some collaterals in his hands, considered at the time of little or no value; though from one of them he realized as much as $900 as late as 1880. This sum, however, ·and the stock sold at *par*, fell far short of indemnifying him, or paying him the combined indebtedness of F. M. Gilmer, and the various firms in which J. N. Gilmer was a partner. On the most liberal interpretation, there is no testimony of any transaction which recognizes that Gilmer had any claim on the stock, which we can affirm took place within eight years of the filing of this bill. *Sanders v. Askew*, 79 Ala. 433.

Whatever class the present transaction may have previously belonged to, when by the transfer on the books the title to the stock became vested in Morris, it acquired the properties of a chattel mortgage, the thing mortgaged being in the possession of the mortgagee. For nine years Morris held both the title and the possession of the stock, and during all that time Gilmer is not shown to have asserted any claim to it. In *Humphries v. Terrell*, 1 Ala. 650—decided by this Court more than forty years ago—it was held that six years' possession of a chattel pledged, without demand made, or recognition of the pledgor's right, vested a complete title in the pledgee. That case has not been overruled, and I am not inclined to overrule it. All men will admit that a period of six years vests in the mortgagee a title to a chattel, held for that length of time in independent right.

We are asked to so far modify the chancellor's decree as to make it a dismissal without prejudice to another suit.

The submission in this cause was on pleadings and evidence. When such is the case, if it be desirable, to have the special ruling of the court on the pleadings, it is customary to prefer a request therefor. That does not appear to have been done in this case. The ruling of the chancellor was on the testimony, and governed by it alone, he reached the conclusion that complainant's claim was barred by staleness. We have examined the testimony with great care, and have reached the conclusion that the chancellor did not err in his rulings on the testimony, nor in the application of the law thereto. If the bill had been all the complainant could desire; if it had averred acts of recognition by Morris, so as to relieve the·claim of the imputation of staleness, the proof in the present record would not sustain such averments. The claim under the proof would still be stale, and barred on that account. This is not a case of sufficient proof, and insufficient averment. If it were, we would grant the motion and dismiss without prejudice. *Cameron v. Abbott*, 30 Ala. 416; *Munchus v. Harris*, 69 Ala. 506; *Gilmer v. Wallace*, 75 Ala. 220; *Glass v. Glass*, 76 Ala. 368;

[Miller v. Jones.]

2 Dan. Ch. Pr. *994-95. The record makes no such case. We are asked to grant the order, not because the complainant has shown a right to recover, but fails through defective pleading. The naked proposition is, that the complainant is entitled to the order, that he may have a chance to aver and prove a better case. Would it not be an anomaly, if we were to hold that where the pleadings and proofs are both insufficient, the dismissal will be without prejudice; and yet, if the pleadings be good, and the proof insufficient, the decree will be absolute and final? Such practice is sanctioned by no sound precedent, and is diametrically opposed to that wholesome principle of equity practice which discourages the re-examination of witnesses once examined, except for good reasons satisfactorily shown; and discountenances enlargement of publication, in the absence of a very strong showing. *Johnson v. Glasscock*, 2 Ala. 249; *Grier v. Campbell*, 21 Ala. 327; *Rumbly v. Stainton*, 24 Ala. 712; *Lanier v. Hill*, 30 Ala. 111; *Malone v. Carroll*, 33 Ala. 191; *Smith v. Coleman*, 59 Ala. 260; *Hammersley v. Lambert*, 2 Johns. Ch. 432; 1 Dan. Ch. Pr. *948-49.

We decline to modify the decree of the chancellor.