GILMER v. MORRIS et al.[1]

*(Circuit Court, M. D. Alabama. June 25, 1888.)*

1. LIMITATION OF ACTIONS—RUNNING OF THE STATUTE—PLEDGE.

Where certificates of stock are pledged to secure an existing indebtedness, and to remain a continuing pledge for advances in the future, the pledgee holds by virtue of the title of the pledgeor, and no adverse holding can begin, so as to allow the statute of limitations to run, until the pledgee repudiates the trust, and gives notice that, in default of payment, he will sell the property.[2]

2. ESTOPPEL—IN PAIS—PLEDGE.

Where a vendor of stock holds the certificates as a pledge to secure certain debts of the vendee, including a balance of interest due thereon, and any advances that may be made in the future, he holds thereafter under the title of the vendee, and cannot claim the property as his own, on the ground that the purchase money was not all paid.

3. JUDGMENT—RES ADJUDICATA—IDENTITY OF ISSUE.

The dismissal of a bill to redeem pledged property on the ground of staleness and the statute of limitations, is not a bar to another bill seeking to redeem the same property, under a pledge made four years after the first one, the cause of action being different, though the same relief be asked.

In Equity. Bill to redeem, and for an account of, certain stocks pledged, and the dividends received.

On September 20, 1886, James N. Gilmer filed his bill against Josiah Morris and others, doing business as Josiah Morris & Co., charging that in 1871 he pledged 120 shares of stock in the Elyton Land Company to said Morris to secure to him $6,000 which the latter had advanced on the purchase money; that soon thereafter one-half of the stock was sold for $6,000, which only left a balance of interest due Morris; that in 1875 another contract was made by which the stock was to be held for the existing indebtedness, and for such loans and advances as might be made in the future, which continued to 1884. The bill prays that Morris be required to account for and pay over all dividends received on the stock after deducting any indebtedness of complainant, and for general relief. Defendants pleaded in bar a decree in a former suit brought in 1884, in the state court, dismissing a bill filed by plaintiff against them for the same relief. It seems that the bill was based on the pledge of 1871, and was dismissed on demurrer on the ground of staleness and the statute of limitations, but after an answer had also been filed. The statute of limitations was also relied on as a defense to the present suit.

*R. C. Brickell, H. C. Semple,* and *W A. Gunter,* for complainant.

*D. S. Troy, H. C. Tompkins, A. T. London,* and *S. F. Rice,* for respondents.

[1] See 30 Fed. Rep. 476, for hearing on plea.

[2] The statute of limitations begins to run against a trust only from the time it is openly and unequivocally disavowed by the trustee. Thomas v. Merry, (Ind.) 15 N. E. Rep. 244. See, also, Price v. Mulford, (N. Y.) 14 N. E. Rep. 298, and note.

So long as the pledgee of stock holds it as collateral security for a debt, and has a right to so hold it, he cannot assert that he holds it adversely to the pledgeor, and thus show title under the statute of limitations. Cross v. Reid, (Cal.) 14 Pac. Rep. 885. A pledgee, in an action against a sheriff who has levied on the pledge as the property of the pledgeor, cannot set up title adverse to the pledgeor acquired after the levy. Barnhart v. Fulkerth, (Cal.) 15 Pac. Rep. 89.

BRUCE, J. The fair conclusion from the evidence in this cause is that on March 30, 1875, Josiah Morris agreed with F. M. Gilmer, who was at the time acting for his son, J. N. Gilmer, the complainant, that the stock which is the subject-matter of this suit, to-wit, 60 shares of the capital stock of the Elyton Land Company, should be held by him, Morris, or by his banking firm of Josiah Morris & Co., as collateral security for the payment of an interest account of about $500, and for about $230, which sum Morris about that time paid in discharge of an execution which had been levied upon the stock, which stock at that time stood in the name of J. N. Gilmer upon the books of the company. The execution was in favor of a creditor of the firm of Gilmer, Browder & Co., of which firm J. N. Gilmer was a member, and, when paid, the stock was transferred by J. N. Gilmer to Josiah Morris on the books of the company. The certificate of the stock was at the time in the possession of Josiah Morris & Co., and had been in their possession since its issue in 1871, when it was pledged for the payment of the purchase money of the stock, which some time thereafter was paid by a sale of one-half of the original 120 shares, which left 60 shares of the stock in pledge for a balance of interest of about $500 due from complainant to Morris & Co. It also appears from the evidence, as a fair conclusion therefrom, that the stock in question was not only to be held by Morris & Co. as collateral security for the payment of the indebtedness which J. N. Gilmer then actually owed Morris & Co., but the stock was to be a basis of credit for future liabilities. In the language of F. M. Gilmer, he (meaning Morris) "was to hold the stock for that advance," (meaning the amount paid to settle the execution which had been levied upon the stock,) and "for all future liabilities of the said J. N. Gilmer." At the time mentioned, March, 1875, there was in existence the firm of Gilmer & Donaldson. Donaldson died in the year 1876, and the firm was succeeded by the firm of J. N. Gilmer & Co., and that firm by the firm of Gilmer & Clanton, and that again by the firm of Gilmer & Merritt. J. N. Gilmer was a member of all these firms, all of which did business in Montgomery, Ala., and had bank accounts with the house of Josiah Morris & Co. It does not very clearly appear from the evidence the precise periods of time that these firms did business with Morris & Co., but that they all did business with, and had accounts with, Morris & Co. in the order named is not questioned, and the last firm of Gilmer & Merritt seems to have carried their business to the year 1884, when a contention arose about a draft of $100, drawn by Gilmer & Merritt, which Morris & Co. refused to pay. The evidence shows that F. M. Gilmer, on and after the 30th day of March, 1875, did make arrangements with Morris & Co. for advances and credit to his son, J. N. Gilmer, and some of the firms with which he subsequently became connected. The testimony is not clear as to the times when these arrangements were made, or when the last time was that the stock in question was alluded to between the parties as a security and basis of credit; but F. M. Gilmer says: "These interviews and conversations extended down to the time that Clanton became a partner in the business, and, indeed, I think during

Clanton's partnership; but after Merritt became a partner I never adverted to that stock as a security." And to the question, "Why?" he answers, "Because Merritt was a very responsible man." The testimony of respondent Morris is not consistent with these conclusions, nor with the testimony of F. M. Gilmer and J. N. Gilmer, whose testimony is in substantial accord, and does not seem to be strained or improbable. As to the interviews and negotiations which F. M. Gilmer testifies he had and made with Morris & Co. for advances and credit to his son and the firms with which he was connected, the testimony is very much that of Gilmer against Morris; but J. N. Gilmer's testimony is in support of that of his father, and the testimony of Morris is not sufficient to disprove it. Not only so, but the testimony of Josiah Morris is not in all points entirely clear; as, for example, where he says: "No, sir; there was no special arrangements. I frequently told Mr. Gilmer he should not have the stock unless he paid me what he owed me; but there was not a time up to 1881 that I would not have readily given him the stock if he and all of them had paid me what they owed me. The stock was not worth as much as the amount they owed me, and was not, up to 1881, worth near the amount they owed me." And in answer to question, "You mean F. M. Gilmer and the accounts of the several firms in which J. N. Gilmer was engaged after the original transaction?" he says, "In which J. N. Gilmer was concerned. I was considering the whole of them."

But without quoting further from the testimony, it seems pretty clear that we have here the pledge of the stock as collateral security for debts due and to be created, and to become due after the 30th day of March, 1875. We have here, then, not merely the existence of a pledge, but we have the nature and character of the pledge, for it was not simply the pledge of the stock to secure the payment of a debt of a specified amount maturing at a definite time in the future, but it was in the nature of a continuing pledge or security; and so long as such relation and understanding existed between the parties in reference to the pledge, it must be admitted that the pledgee (Morris, in this case) was holding in virtue of the title and right of the pledgeor, Gilmer, and could not be considered as holding adversely to such title and right, for there is perhaps no principle of law better settled than that possession, to give title, must be adversary. Whatever difficulty there may be from the evidence to fix the time or times after the 30th of March, 1875, when F. M. Gilmer negotiated with Morris for advances of money and credit to J. N. Gilmer, or to the firms with which he became connected, upon the faith of this stock as collateral security, it is certainly clear that Morris & Co., on and after the 30th day of March, 1875, did hold the stock in question as collateral security, and did have accounts and do business with the different firms with which J. N. Gilmer became connected, and did advance money to some of them by paying their checks when they had no money on deposit with Morris & Co. at the time the checks were drawn and paid.

The defense here is staleness of the demand, and laches on the part of the complainant, and the statute of limitations of six years of the

state of Alabama. The bill was filed September 20, 1886, more than eleven years after the pledge of March, 1875, but about two years after the firm of Gilmer & Merritt ceased to do business with Josiah Morris & Co., and how long after the other firms with which J. N. Gilmer was connected ceased to do business with Morris & Co. is not clear, but certainly it was some years after the pledge of 1875. But, as matter of law, is it important to ascertain with more particularity as to the last date when arrangements were made for credit on the faith of this security, or when the last check was drawn and paid by Morris & Co. on the faith of this security? If it be true that on and after the 30th day of March, 1875, Morris & Co. held the stock as collateral, not only for debts then due, but also for debts to be created and become due, then we not only have the pledge, but also the character of the pledge, and the relations of the parties to it. And now, when was it after that time that these relations changed? When was it that Morris repudiated the trust in which he held the stock, and gave notice to Gilmer that in default of payment and redemption of the pledge he would sell the property, or seek the aid of a court to enforce his rights in regard to it? There seems to be no fact or facts in the evidence that would fix such a time unless it be in the year 1884, when the check for $100 which was drawn by Gilmer & Merritt was refused payment by Morris & Co., and when Gilmer, in conversation with Morris, referred to his Elyton land stock, and Morris replied, "Why, Jimmy, that was never yours; it was your father's;" and in the same conversation told him he had sold that property to pay an indebtedness his father owed him. It is claimed, however, that the law is settled in Alabama that in the case of the pledge of stocks as collateral security, that the contract partakes of the nature of a mortgage of personal property, and that the rules applicable to mortgages are to be applied, and not those applicable to a strict pledge; and the case of *Gilmer* v. *Morris*, 80 Ala. 78, and authorities there cited, are relied on in support of this proposition. In the case cited, at page 83, the court says:

"It is not questioned, as far as we know, by any authority, that the pledgeor may always claim at least the period of six years, or the full period of time during which the pledgee is permitted to sue upon his secured debt or engagement. In *Humphres* v. *Terrell*, 1 Ala. 650, it was held that the right both of a pledgeor and of a mortgagor to redeem personal property would be barred in six years; and the plea of the statute of limitations of six years in that case was held good as a bar to the pledgee's right to redeem without any positive evidence of an adverse possession."

The court, however, in the same page, recognizes a distinction between a pledge and a mortgage, when it says:

"The case of a mere pledgee, it is apprehended, is different in some material respects from that of a mortgagee in possession, in whose favor the statute of limitations commences to run from the law-day of the mortgage, because of his presumed adverse holding from that time."

It would seem doubtful at least if the court intended to settle the law in Alabama that in the case of a pledge of stocks as collateral security the presumption of an adverse holding on the part of a pledgee would

arise in his favor from the maturity of the secured debt without demand or notice to the pledgeor. In the case of *Nabring* v. *Bank*, 58 Ala. 204, it is said: "We think the bank was pledgee, and not mortgagee, of these shares. They were put in pledge to it for the payment of the money Nabring borrowed, and there remained in Nabring a legal right to demand and have them on the payment of the debt;" citing authorities, and going on to say: "As pledgee, the bank had no right to sell the shares without first demanding payment of the debt from Nabring, or giving him notice of the intention to sell. * * *" But if the law was settled in Alabama, as claimed, still the question remains, how far, on a question of this kind, so intimately connected with the general commerce of the country, this court would be bound by it? But, not to dwell upon this point, it is clear that none of the cases cited by the supreme court of Alabama in the opinion in *Gilmer* v. *Morris, supra,* were cases of pledge of stocks as security of the character of that under consideration here. The court in that case had under consideration the pledge of 1871; and whatever the character of that pledge, and the rights of the parties under it, this court has held that the pledge of 1875 was a new and different pledge, involving a new and different trust from that of the pledge of 1871. If to the pledge now under consideration we undertake to apply the rule contended for, then we must inquire, when did the debt the payment of which was secured by this pledge mature and become due? And when was the law-day of this pledge at which the presumption of adverse holding on the part of the pledgee would arise? It is manifest that to a pledge of the kind now under consideration, contemplating as it did future debts, such a rule, even if well founded, could not apply. It is not deemed necessary to discuss the law on this subject further, for if the conclusions reached in reference to the nature and character of the pledge in question be correct, then there is no time prior to the year 1884 when the statute of limitations of six years could begin to run in favor of Morris, and no room for the imputation of laches to the complainant in this suit. If the commencement of the litigation was stimulated by the rapid advance of the value of the stock in question, still it is not clear how that could give Morris the right, without notice and without demand, to treat the stock as his own, or sell and appropriate the proceeds, unless a much greater length of time had elapsed than is shown here to justify a conclusion of the abandonment of the stock for the debt. This case does not fall within the rule of *Hayward* v. *Bank*, 96 U. S. 611.

It is insisted, however, that the evidence shows that the complainant never had any right to or interest in the stock which is the subject-matter of this suit; that the only interest he ever had in it was the mere option to purchase it at a given price, which option was never closed by the payment of the purchase money. If it was a mere option in the first place, and based upon no consideration, yet the fact remains that the stock was paid for, except as to the interest for the time Morris carried it, and his conduct in regard to it afterwards shows that, whatever may have been his strict legal rights in regard to the stock, he did not

stand on such ground; and whether this arose from the favor to the elder Gilmer, or a desire to secure and hold his influence in favor of an enterprise, the success of which was vital to the value of the stock of which he was a large owner, or whatever the motive may have been, certain it is he changed his position when he agreed to hold the stock as collateral security, and cannot now be heard to say that because the last dollar of the purchase money was not paid the stock is still his property, as it originally was, and no right to it ever passed to this complainant.

The respondent offers in evidence the briefs of counsel, and the record of the cause in the state court, to show that the question of the statute of limitations and staleness of the demand in suit were in point of fact heard and determined by the decree in the state court.    To this evidence the complainant objected, and contends that these questions were not tendered in issue by his bill in the suit in the state court, and therefore not pertinent here; that a decree of a court must be confined to the allegations in the pleadings upon which it is founded, and that arguments and proofs and decrees of courts outside of the scope of the pleadings cannot be held to be matter of estoppel, and will be restrained by construction to the matter in issue in the pleadings.    This is not a case of vagueness and uncertainty as to what the issues were which were matter of decision in the state court, nor is it a case of contention as to what matters were decided as between defendants to a bill, as in the case of *Corcoran* v. *Canal Co.*, 94 U. S. 744.    And upon this hearing it does not seem that the question of *res adjudicata* is presented in other or stronger light in favor of the respondents than it was in the hearing on the sufficiency of the plea in bar to this suit.    30 Fed. Rep. 476.

Since this case was heard, my attention has been called to the recent case of *Bissell* v. *Spring Valley Township*, 124 U. S. 225, 8 Sup. Ct. Rep. 495.    Whatever may be said of the case, it is quite different in its facts from the case at bar, and the point decided there seems to be that the finding of facts in a former suit, upon demurrer, which were fatal to the bonds from which the coupons in suit were cut, was equally fatal to a suit between the same parties upon other coupons cut from same bonds as if the facts in the first suit had been found by the verdict of a jury. It may be said in that case that there was no new or different cause of action set up in the second suit, which was an attempt to recover on other coupons, it is true but coupons, of the same bonds which had been found to have been issued without authority of law, and therefore void. This case and the case of *Cromwell* v. *Sac Co.*, 94 U. S. 351, are cases of suits at law upon coupons, issued by municipal corporations, and in that class of cases there is little ground for a distinction between the cause of action and the subject-matter of the action.    In the case at bar the suit is not upon bonds, which are at the same time the cause and subject-matter of the action, but it is a suit in equity, for the same right as the former suit, but asserting a new and distinct cause of action.    Even in this *Spring Valley Case*, the court, at page 232, says there are undoubtedly many cases where a final judgment upon a demurrer will not conclude as to a future action; the demurrer may go to the form of the

action, to a defect in the pleading, or the jurisdiction of the court; * * * and on the previous page the court say that the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted upon the determination of which the finding or verdict was rendered. The supreme court of Alabama, in the case of *Hanchey* v. *Coskrey*, 81 Ala. 150, 1 South. Rep. 259, Judge CLOPTON, speaking for the court, says: "The doctrine of estoppel by judicial proceedings is qualified by the established limitation that the judgment must be a decision on the merits, a judgment founded upon non-joinder or misjoinder of parties, or merely defective pleading, or any technical ground or collateral or incidental questions whereby the merits of the case were not and could not have been determined, will not preclude an inquiry into the merits in a subsequent suit so instituted as to avoid the objection by which the first was defeated;" citing authorities. This is certainly on a line with the doctrine of the case of *Gould* v. *Railroad Co.*, 91 U. S. 534, which has neither been overruled nor modified. The decree is for complainant, and will be entered accordingly.