## GILMER v. BILLINGS et al.

### (Circuit Court, M. D. Alabama. January 9, 1890.)

1. PLEDGE—LIMITATION OF ACTIONS—LACHES.

Where stock in a corporation is pledged to a bank to secure an existing debt, and also future advances made to a firm or firms in which the owner of the stock is a partner, and such advances are in fact made in the course of business for a number of years, the pledge constitutes a continuing pledge, and the possession of the pledgee will not become adverse, so as to set the statute of limitations running, or to render laches imputable to the pledgor, until such time as by some positive act or declaration the pledgee repudiates the trust, and claims to hold in his own right. Haywood v. Bank, 96 U. S. 611, distinguished.

2. SAME—SALE—ESTOPPEL.

Defendant, owning stock in a corporation, either sold it to plaintiff, or gave him an option to purchase it. Defendant continued to hold it, and, after a considerable time, one half the stock was sold in payment of the purchase price, leaving due only the interest which had accrued to defendant. Thereafter it was agreed between the parties that defendant should continue to hold the stock as collateral security for such interest, and also for future advances, which advances were in fact from time to time made. *Held* that, although the original agreement was only an option to purchase, defendant had recognized the sale as accomplished, and was estopped from claiming that, inasmuch as the purchase money was never entirely paid, title had not passed to plaintiff.

3. RES JUDICATA—PLEDGE—BILL TO REDEEM.

In 1884 a bill was filed in an Alabama court to redeem certain shares of stock alleged to have been pledged in 1871. A demurrer to the bill, raising the questions of laches and of limitation, as permitted by the state practice, was sustained, and thereupon final judgment was entered dismissing the bill. *Held*, that this judgment did not bar a subsequent suit between the same parties in a federal court to redeem the same stock, upon a bill alleging a different pledge made in 1875 to secure moneys due and to become due for future advances, which advances were in fact made.

In Equity. Bill by James N. Gilmer against Josiah Morris and others to redeem certain shares of stock pledged as collateral security. Morris having died pending the suit, his executors, F. M. Billings, B. J. Baldwin, and Hewlett Baldwin, were substituted as defendants. Decree for complainant.

An opinion was heretofore rendered on a plea setting up a prior adjudication in an Alabama court. 46 Fed. Rep. 333. Prior to the institution of this suit a similar suit had been brought in this court, in which the same defense was overruled, (30 Fed. Rep. 476,) but on appeal to the supreme court the judgment was reversed, with directions to dismiss the suit for want of proper averments showing jurisdiction, (129 U. S. 315, 9 Sup. Ct. Rep. 289.)

W. A. Gunter, R. C. Brickell, and H. C. Semple, for complainant.

H. C. Tompkins, for respondents.

BRUCE, District Judge. The opinion pronounced on a former hearing of a cause involving the matter now in dispute contains all I care to say upon this submission, and that opinion, as shown below, and altered to suit the occasion, is adopted. The fair conclusion from the evidence in this cause is that on March 30, 1875, Josiah Morris agreed with F. M. Gilmer, who was at that time

acting for his son, J. N. Gilmer, the complainant, that the stock
which is the subject-matter of this suit, to wit, 60 shares of the capital
stock of the Elyton Land Company, should be held by him, (Mor
ris,) or by his banking firm of Josiah Morris & Co., as collateral
security for the payment of an interest account of about $500,
and for about $230 which Morris about that time paid in discharge
of an execution which had been levied upon the stock, which at
that time stood in the name of J. N. Gilmer upon the books of the
company. The execution was in favor of one Farley, a creditor
of the firm of Gilmer, Browder & Co., of which firm J. N. Gilmer
was a member, and, when paid, the stock was transferred by J. N.
Gilmer to Josiah Morris on the books of the company. The certifi-
cate of stock was at that time in the possession of Josiah Morris,
and had been in his possession since its issue in 1871, when it was
pledged for the payment of the purchase money of the stock, which,
some time thereafter, was paid by the sale of one half the original
120 shares, which left 60 shares of the stock in pledge for a balance
of interest on the original cost of about $500 due from complainant
to Josiah Morris. It also appears from the evidence, as a fair con-
clusion therefrom, that the stock in question was not only to be
held by Morris as a collateral security for the payment of the in-
debtedness which J. N. Gilmer then actually owed Morris and his
firm of Josiah Morris & Co., but the stock was to be a basis of credit
for future liabilities. In the language of F. M. Gilmer, at page 10
of his deposition in the former suit in this court, he (meaning Mor-
ris) "was to hold the stock for that advance," (meaning the amount
paid to settle the execution which had been levied upon the stock,)
and "for all future liabilities of the said J. N. Gilmer." At the
time mentioned—March, 1875—there was in existence the firm
of Gilmer & Donaldson. Donaldson died in the year 1876, and
that firm was succeeded by the firm of J. N. Gilmer & Co., and
the latter by the firm of Gilmer & Clanton, and the last by Gilmer
& Merritt. J. N. Gilmer was a member of all these firms, all of
which did business in Montgomery, Ala., and had bank accounts
with the house of Josiah Morris & Co.

It does not very clearly appear from the evidence the precise
period of time that these firms did business with Morris & Co., but
that they all did business with and had accounts with Morris &
Co., in the order named, is not questioned, and the last firm, of Gil-
mer & Merritt, seems to have carried their business into the year
1884, when a contention arose about a draft of $100 drawn by
Gilmer & Merritt, which Morris & Co. refused to pay. The evidence
shows that F. M. Gilmer, on and after the 30th day of March,
1875, did make arrangements with Josiah Morris & Co. for ad-
vances and credit to his son, J. N. Gilmer, and some of the firms
with which he subsequently became connected. The testimony is
not clear as to the time when these arrangements were made, or
when the last time was that the stock in question was alluded to
between the parties as a security and basis of credit, but F. M.
Gilmer says, on page 19 of his deposition: "These interviews and
conversations extended down to the time that Clanton became a

partner in the business, and, indeed, I think, during Clanton's partnership; but after Merritt became a partner I never adverted to that stock as a security;" and to the question, "Why?" he answers, "Because Merritt was a very responsible man." While the testimony of the testator, Josiah Morris, is not entirely consistent with these conclusions, or with the testimony of F. M. Gilmer and J. N. Gilmer, whose testimony is in substantial accord, and does not seem to be strained or improbable, it is not on all points clear, and, taken in connection with the admissions of the answer, it may be said to establish the contention of the complainant that there was, in 1875 and afterwards, a pledge of the stock for other debts than the original cost, and as a security for such future debts as might be contracted by complainant and his firms. He admits, as does the answer, that the amount paid in March, 1875, to satisfy the Farley execution against complainant, and to save the stock from sale, was charged to complainant's firm of Gilmer & Donaldson, presumably with their knowledge and consent. He further states that he regarded F. M. Gilmer as a member and manager of complainant's firms, and that his (Morris') understanding was that the stock was not to be delivered until all his debts against all the Gilmer firms were paid, closing with the statement: "There never was a time, you may say, up to 1881,—possibly 1882,—that I would not have delivered the stock upon the payment of the several firms' indebtedness to me." The answer of the executors insists and claims that in no event could complainant claim the stock until he "had paid defendants' testator all sums which he or they might owe defendants' testator or his said firm of Josiah Morris & Co.; and defendants aver that on the 30th of March, 1875, said complainant was indebted to their testator, and to the firm of Josiah Morris & Co., in a large sum, which indebtedness complainant was bound in equity and good conscience to pay before demanding from defendants' testator a conveyance of said stock;" and in the next paragraph it is stated that complainant's indebtedness, through his firm of Gilmer & Donaldson, had not been paid at the date of the filing of the answer. It is clear that this claim involves an unqualified admission of the averment of the bill that the stock in question was pledged in 1875, and afterwards, for the debts of complainant's firms. Without quoting further from the testimony or referring to other admissions in the answer, it seems that they establish, without the aid of the Gilmer testimony, that the stock stood as collateral security for debts due, and to be created and to become due, after the 30th day of March, 1875.

We have, then, not merely the existence of a pledge, but we have the nature and character of the pledge, for it was not simply the pledge of stock to secure the payment of a debt or a specified amount maturing at a definite time in the future, but it was in the nature of a continuing pledge or security; and, so long as such relation and understanding existed between the parties in reference to the pledge, it must be admitted that the pledgee (Morris, in this case) was holding in virtue of the title and right of the pledgor, Gilmer, and could not be considered as holding adversely to such

title and right, for there is perhaps no principle of law better settled than that possession, to give title, must be "adversary." Kirk v. Smith, 9 Wheat. 288; Maury v. Mason, 8 Port. (Ala.) 222, 223; Tyler, Ej. 860, 861, 876, 877.

Whatever the difficulty may be, from the evidence, to fix the time or times after the 30th of March, 1875, when F. M. Gilmer negotiated with Morris for advances of money and credit to J. N. Gilmer or the firms with which he became connected, upon the faith of this stock as collateral security, it is certainly clear that Morris & Co., on and after the 30th of March, 1875, did hold the stock in question as collateral security for such advances and credit, and did have accounts and do business with the different firms with which J. N. Gilmer became connected, and did advance money to some of them by paying their checks when they had no money on deposit with Morris & Co. at the time the checks were drawn and paid, and we have seen that the answer claims some of such indebtedness is still unpaid.

The defense here is staleness of the demand, and laches on the part of complainant, and the statute of limitations of six years in the state of Alabama. The bill was filed on the 9th day of January, 1890, more than fourteen years after the pledge of March, 1875, but within six years after the firm of Gilmer & Merritt ceased to do business with the firm of Josiah Morris & Co.; and how long after the other firms with which J. N. Gilmer was connected ceased to do business with Morris & Co. is not clear, but certainly it was some years after the pledge of 1875. Defendants admit in their answer that the last collection from J. N. Gilmer & Co. was made on the 3d day of October, 1883. But, as matter of law, is it important to ascertain with more particularity as to the last date when arrangements were made for credit on the faith of this security, or when the last check was drawn on, and paid by, said Morris & Co. on the faith of this security? If it be true that on and after the 30th day of March, 1875, Morris & Co. held the stock as collateral, not only for debts then due, but also for debts to be created and become due, then we not only have the pledge, but also the character of the pledge and the relations of the parties to it; and, now, when was it after that time that these relations changed? When was it that Morris repudiated the trust in which he held the stock, and gave notice to Gilmer that in default of payment and redemption of the pledge he would sell the property, or seek the aid of a court to enforce his right in regard to it? There seems to be no fact or facts in the evidence that would fix such a time, unless it be in the month of June, 1884, when the check for $100, which was drawn by Gilmer & Merritt, was refused payment by Morris & Co., and when Gilmer, in conversation with Morris, referred to his Elyton Land stock, and Morris replied: "Why, Jimmy, that never was yours; it was your father's;" and in the same conversation told him he had sold the property to pay an indebtedness his father owed him. Morris, in his deposition in the state court, fixes this date as the month prior to the filing of the bill in the state court, which bill was filed on the 7th of July, 1884. It is thus apparent that

six years had not elapsed between the repudiation of the trust and the filing of the bill in this case.

It is claimed, however, that the law is settled in Alabama that, in the case of the pledge of stock as collateral security, the contract partakes of the nature of a mortgage of personal property, and that the rules applicable to mortgages are to be applied, and not those applicable to a strict pledge; and the case of Gilmer v. Morris, 80 Ala. 78, and the authorities there cited, are relied on in support of this proposition. In the case cited, at page 83, the court says:

"It is not questioned by any authority, so far as we know, that the pledgor may always claim at least the period of six years, or the full period of time during which the pledgee is permitted to sue upon his secured debt or engagement. In Humphres v. Terrell, 1 Ala. 650, it was held that the right of both pledgor and mortgagor to redeem personal property would be barred in six years, and the plea of the statute of limitations of six years in that case was held good as a bar to the pledgor's right to redeem, without any positive evidence of an adverse possession."

The court, however, on the same page recognizes a distinction between a pledge and a mortgage, when it says:

"The case of a mere pledgee, it is apprehended, is different in some material respects from that of a mortgagee in possession, in whose favor the statute of limitations commences to run from the law day of the mortgage, because of his presumed adverse holding from that time."

It would seem doubtful, at least, if the court intended to settle the law in Alabama that, in the case of a pledge of stocks as a collateral security, the presumption of an adverse holding on the part of a pledgee would arise in his favor from the maturity of the secured debt, without demand or notice to the pledgor. In the case of Nabring v. Bank, 58 Ala. 204, it is said:

"We think the bank was pledgee, and not mortgagee, of these shares. They were put in pledge to it for the payment of money Nabring borrowed, and there remained in Nabring a legal right to demand and have them on the payment of the debt, [citing authorities, and going on to say:] As pledgee the bank had no right to sell the shares without first demanding payment of the debt from Nabring, or giving him notice of the intention to sell, [which seems to be the settled commercial law of the world. Jones, Pledges, § 602 et seq.]"

But, if the law was settled in Alabama as claimed, still the question remains, how far on a question of this kind, so intimately connected with the general commerce of the country, this court would be bound by it. But, not to dwell upon this point, it is clear that none of the cases cited by the supreme court of Alabama in the opinion in Gilmer v. Morris, supra, were cases of pledge of stocks as security of the character of that under consideration here. The court in that case had under consideration the pledge of 1871, for a distinct and definite debt then due; and, whatever the character of that pledge, and the rights of the parties under it, this court has held that the pledge of 1875 was a new and different pledge, involving a new and different trust from that of the pledge of 1871 for the purchase money of the stock.

If to the pledge now under consideration we undertake to apply the rule contended for, then we must inquire, when did the debt, the

payment of which was secured by this pledge, mature and become due? And when was the law day of this pledge, at which the presumption of adverse holding on the part of the pledgee would arise? The answer admits, and the testimony shows, that since 1883 large dividends have been received by the pledgee upon the stock in question, amounting, in the aggregate, to as much as 100 per centum per annum. It seems to be well settled that the reception of these dividends, on a security held under an express and continuing trust, stand precisely as if the pledgor had personally paid the dividends to the pledgee on the secured debt, since the collection and application of the dividends was by the pledgee as the trustee and agent of the pledgor; and it is also well settled that every such payment is a renewal of the trust, and an acknowledgment of its obligations. Whetstone v. Whetstone, 75 Ala. 502; Perry, Trusts, § 863, and note; Kane v. Bloodgood, 7 Johns. Ch. 90; Bank v. Armstrong, 50 Fed. Rep. 805; West v. Bank, 19 Vt. 409. It is thus manifest that each collection of a dividend on the stock held in pledge was a recognition and acknowledgment of the trust, if the rule invoked by the respondents was well founded, and applicable to the pledge under consideration, contemplating, as it did, future debts; but no such rule could be applied to a pledge for future dealings.

It is not deemed necessary to discuss the law on this subject further, for, if the conclusion reached in reference to the nature and character of the pledge in question be correct, then there is no time prior to the month of June, in 1884, when the statute of limitations of six years could begin to run in favor of Morris, and no room for the imputation of laches to the complainant in this suit. If the commencement of the litigation was stimulated by the rapid advance of the stock in question, it is not clear how that could give Morris the right, without notice and without demand, to treat the stock as his own, or sell and appropriate the proceeds, unless a much greater length of time had elapsed than is shown here, to justify a conclusion of the abandonment of the stock for the debt. This case does not fall within the rule of Haywood v. Bank, 96 U. S. 611. In that case the pledgee notified the pledgor that, unless the debt was paid, the stocks would be sold. The pledgor failed, after repeated demands, to pay the debt, and the stocks were sold under the agreement under which they were pledged, and the proceeds credited to the borrower on the loan. The pledgor was advised of the sale and credit, and made no objection until nearly four years after the sale, when, the stocks having in the mean time greatly increased in value, he sought to redeem the stocks. In this case the pledge was for future debts, and there was no notice or demand for redemption of the stock, and no notice that a sale had been or would be made; and it in fact appears that no sale ever was made, or a credit given for the proceeds of a sale.

It is insisted, however, that the evidence shows that the complainant never had any right to or interest in the stock which is the subject-matter of this suit; that the only interest he ever had in it was the mere option to purchase it at a given price, which

option was never closed by the payment of the purchase money. If it was a mere option in the first place, and based upon no consideration, which is by no means admitted, yet the fact remains that the stock was paid for, except as to the interest on the purchase money for the time Morris carried it, and his conduct in regard to it afterwards shows that, whatever may have been his strict legal rights in regard to the stock, he did not stand on such ground; and whether this arose from a desire to favor the elder Gilmer, or a desire to secure and hold his influence in favor of an enterprise, the success of which was vital to the value of the stock, of which he was a large owner, or whatever the motive may have been, certain it is he changed his position when he agreed to hold the stock as collateral security, and cannot now be heard to say that, because the last dollar of the purchase money was not paid, the stock is still his property, as he claims it originally to have been, and that no right to it ever passed to this complainant.

The respondents offer in evidence the briefs of counsel and the record of the cause in the state court, to show that the questions of the statute of limitations and staleness of the demand in suit were in point of fact heard and determined by the decree in the state court. To this evidence the complainant objected, and contends that these questions were not tendered in issue by his bill in the suit in the state court except as raised upon the demurrer of the respondents, and therefore are not pertinent here; that a decree of a court must be confined to the allegations in the pleadings upon which it is founded, and that arguments and proofs and decrees of the courts outside of the scope of the pleadings cannot be held to be matter of estoppel, and will be restrained, by construction, to the matter in issue in the pleadings. "The rule," says Mr. Freeman, "that no judgment is conclusive of anything not required to support it, is not a mere rule of construction, * * * but is an unyielding restriction of the powers of the parties, of the court, and of the jury." Freem. Judgm. § 271; Reynolds v. Stockton, 140 U. S. 254, 11 Sup. Ct. Rep. 773. This is not a case of vagueness and uncertainty as to what the issues were which were matter of decision in the state court, nor is it a case of contention as to what matters were decided as between defendants to a bill, as in the case of Corcoran v. Canal Co., 94 U. S. 744; and upon this hearing it does not seem that the question of res adjudicata is presented in other or stronger light in favor of the respondents than it was in the hearing on the sufficiency of the plea in bar of this suit.

My attention has been called to the case of Bissell v. Spring Valley Tp., 124 U. S. 225, 8 Sup. Ct. Rep. 495. There appears to be a mistake in the report of that case. On page 230, 124 U. S., and 498, 8 Sup. Ct. Rep., it is stated: "The judgment of this court 'sustaining' the demurrer * * * was, therefore, an adjudication that the bonds * * * were not binding obligations." But on referring to the former case (110 U. S. 165, 3 Sup. Ct. Rep. 555) it will be seen that "overruling" should have been used instead of "sustaining." This relieves the case of all difficulty as an authority; the point of decision being that a judgment in favor of a defendant, upon the

plaintiff's demurrer to his plea to the merits being overruled, and the refusal of the plaintiff to amend, is conclusive on the plaintiff. In that case the former suit was founded upon coupons of a series of bonds, the defendant answered, setting up the invalidity of the bonds from which the coupons were cut, the plaintiff demurred to the answer, the court overruled the demurrer, and thus established the sufficiency of the plea or answer, and the plaintiff, not amending or replying to the plea or answer, thereby admitted that no answer could be made, and thus final judgment for the defendant was conclusive as to the invalidity of the bonds. Upon a second suit, upon other coupons from the same bonds, this judgment was held conclusive against the plaintiff. It is evident that the suit in 124 U. S. 225, 8 Sup. Ct. Rep. 495, could not be sustained except upon the establishment of the validity of the bonds from which the coupons were cut; and, as that question had been directly presented and decided against the plaintiff in the former suit, the latter suit was properly held barred by the former adjudication. The former suit in the state court in this case was founded on the original pledge of 1871. The defendant demurred to the complaint as insufficient, because there was no averment of recognition of the pledge from the original transaction to the filing of the bill, in July, 1884. The court sustained the demurrer, holding that by the law of Alabama a pledge for a distinct debt is barred in six years from the maturity of the debt or the last recognition of the pledge. But this cause of action is founded upon the pledge of 1875, for the security of other and distinct debts then and thereafter to be created, with averments and proof of recognition avoiding any statute of limitations, and thus, though relating to the same subject-matter as the former suit, is not the same cause of action, and is not barred by judgment on the demurrer to the former cause of action. Gould v. Railroad Co., 91 U. S. 526; Cromwell v. Sac Co., 94 U. S. 351; Hanchey v. Coskrey, 81 Ala. 149, 1 South. Rep. 259.

The maintenance of this suit is entirely consistent with the adjudication in the former suit, which was merely that under the laws of Alabama no cause of action was stated in the bill. That judgment operates as a mutual estoppel upon the parties to say that averments of recognition were not necessary to state a cause of action, and the complainant, accepting the decision in the present suit, avoids the demurrer which was fatal in the former suit, by averring and proving a new, different, and subsequent cause of action, involving a continuous recognition of the trust until its repudiation, in June, 1884.

A decree will be entered for the complainant.